# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SURF'S UP LEGACY PARTNERS, LLC (f/k/a KAABOO, LLC), EVENTPRO MANAGEMENT, LLC (f/k/a KAABOO MANAGEMENT, LLC), EVENTPRO PRODUCTION SERVICES, LLC (f/k/a KB EVENTPRO, LLC), EVENTPRO DEL MAR, LLC (f/k/a KAABOO - DEL MAR, LLC), EVENTPRO SERVICES, LLC (f/k/a KAABOOWORKS SERVICES, LLC), EVENTPRO CONTRACT SERVICES, LLC (f/k/a KAABOO CONTRACT SERVICES, LLC), and EVENTPROWORKS, LLC (f/k/a KAABOOWORKS, LCC), | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs-Counterclaim Defendants, | ) ) | C.A. No. N19C-11-092 PRW CCLD |
| v. | ) ) | |
| VIRGIN FEST, LLC, VFLA EVENTCO, LLC, and KSD OWNCO, LLC (f/k/a SAN DIEGO FEST OWNCO, LLC), | ) ) ) ) | |
| Defendants-Counterclaim Plaintiffs, | ) ) | |
| VIRGIN FEST INVESTCO, LLC, | ) ) | |
| Defendant-Counterclaim Plaintiff-Counterclaim Defendant. | ) ) ) | |

Submitted: December 9, 2020
Decided: January 13, 2021

*Upon Defendant-Counterclaim Plaintiff-Counterclaim Defendant Virgin Fest Investco, LLC's Motion to Dismiss*
**GRANTED**

*Upon Plaintiffs-Counterclaim Defendants Surf's Up Legacy Partners, LLC, et al., Counterclaim Plaintiff-Counterclaim Defendant Bryan Gordon, and Counterclaim Defendants Robert Walker and Seth Wolkov's Motion to Dismiss*
**DENIED**


## MEMORANDUM OPINION AND ORDER


Theodore A. Kittila, Esquire, James G. MacMillan, III, Esquire, HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware, *Attorneys for Plaintiffs-Counterclaim Defendants Surf's Up Legacy Partners, LLC, et al., Counterclaim Plaintiff-Counterclaim Defendant Bryan Gordon, and Counterclaim Defendants Robert Walker and Seth Wolkov*.

Eric M. George, Esquire (*pro hac vice*), Kim S. Zeldin, Esquire (*pro hac vice*), BROWNE GEORGE ROSS LLP, Los Angeles, California, *Attorneys for Plaintiffs-Counterclaim Defendants Surf's Up Legacy Partners, LLC, et al.*

Robert K. Beste, Esquire, Jason Z. Miller, Esquire, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware, *Attorneys for Defendants-Counterclaim Plaintiffs Virgin Fest, LLC, et al., and Defendant-Counterclaim Plaintiff-Counterclaim Defendant Virgin Fest Investco, LLC.*

Marvin S. Putnam, Esquire (*pro hac vice*), Jessica Stebbins Bina, Esquire (*pro hac vice*), R. Peter Durning, Jr., Esquire (*pro hac vice*), LATHAM & WATKINS LLP, Los Angeles, California, *Attorneys for Defendant-Counterclaim Plaintiff-Counterclaim Defendant Virgin Fest Investco, LLC*.


**WALLACE, J.**

This decision is a mash-up comprised of two tunes from a litigation soundtrack produced by the breakdown of a business relationship between the entities that orchestrated the KAABOO and Virgin Fest live music and outdoor entertainment festivals. Seven Delaware limited liability companies that planned and operated events under the KAABOO label (collectively, the "KAABOO Entities") allege Virgin Fest Investco, LLC ("Investco"), a Delaware limited liability company, tortiously interfered with the contractual network they created with Investco's affiliates until they were silenced into complete non-performance. In one of many responses, Investco, together with those affiliates (also Delaware limited liability companies—collectively, the "Virgin Fest Entities"), allege three of the KAABOO Entities' managers, Bryan Gordon, Robert Walker, and Seth Wolkov (human beings—collectively, the "Managers") engaged in various acts of fraud causing the Virgin Fest Entities to deal with the KAABOO Entities when they otherwise wouldn't have.

In the first motion ("Motion I"), Investco seeks dismissal of the tortious interference claim on affiliate privilege grounds. The affiliate privilege doctrine immunizes a controller from tort liability for its affiliates' contractual breaches. The privilege is not absolute, however, and will not protect a controller that induces its affiliates' breaches in bad faith. Seizing on this exception, the KAABOO Entities insist their allegations show Investco's bad faith. But the Court doesn't hear it.

Accordingly, Motion I is **GRANTED** and that tortious interference claim is **DISMISSED**.

In the second motion ("Motion II"), the KAABOO Entities and Managers seek dismissal of three fraud-based accusations, contending that contractual provisions bar fraud claims against the Managers and alternatively, that the Virgin Fest Entities do not allege fraud with Rule 9(b) particularity. Applying the well-settled plain meaning analysis, the Court finds that those provisions unambiguously permit the fraud counterclaims to proceed against the Managers. Facing no other stops, the Court also finds that the Virgin Fest Entities have satisfied Rule 9(b)'s heightened pleading standard and allows those counterclaims to sound another day. Accordingly, Motion II is **DENIED**.

# I. FACTUAL BACKGROUND

A consolidated disposition resolving dueling (but not cross) motions to dismiss requires a bit of range to score. The allegations blaring from both sides are divergent and hotly-contested and one may rightly think the stories hopelessly disharmonious. But, the Court must here accept much of each tale as true, and will shepherd the opposing views of the facts within neighboring fences for clarity's sake.

## A. MOTION I'S ALLEGATIONS – THE KAABOO VIEW.

The KAABOO Entities were formed to plan and operate live festivals and sought to strengthen their hold on that industry.[1] In 2017, they recruited Jason Felts as a director to leverage his influence within the Virgin Group conglomerate and open a pathway to collaboration with those firms.[2] This led to the creation of the three defendant Virgin Fest Entities, including Virgin Fest, LLC, which wholly owns the others and is managed solely by Investco.[3] A joint venture with those newly-developed counterparties had been conceived to expand KAABOO's audiences by advertising live events under Virgin Group branding in market segments previously-

---

[1] The KAABOO Entities' Complaint ¶¶ 22-23 (D.I. 1) ("KAABOO Compl.").

[2] *Id.* ¶ 29.

[3] *Id.* ¶¶ 30-31.

unexplored.[4] Despite its potential, though, the common enterprise was met with hardship that ultimately would clarion the beginning of its end.[5]

In 2019, the KAABOO Entities suffered a series of reversals and failed to attract investors.[6] To avoid a liquidity crisis, the KAABOO Entities concluded a fundamental change was in order.[7] Instead of running their own live events, the KAABOO Entities decided they should manage the live events of others.[8] Achieving this objective would require the transfer of overperforming assets, including their most lucrative event, to a willing buyer.[9] And so, they turned to the Virgin Fest Entities.[10]

The parties executed a Letter of Intent ("LOI") to sell the Virgin Fest Entities a number of upcoming or planned festivals and a license to use KAABOO-related intellectual property for those events.[11] Among the terms were multi-million dollar

---

[4]   *Id.*

[5]   *Id.* ¶¶ 35-36.

[6]   *Id.*

[7]   *Id.*

[8]   *Id.*

[9]   *Id.* ¶¶ 36-37.

[10]   *Id.* ¶¶ 39-40.

[11]   *Id.*

payments from the Virgin Fest Entities and a management arrangement whereby the KAABOO Entities would run the events the Virgin Fest Entities purchased.[12] The transaction was scheduled to close shortly before the KAABOO Entities' most lucrative festival—on the same day many of the bills necessary to secure artists and vendors came due.[13]

Between the LOI and closing date, the KAABOO Entities' financials deteriorated further.[14] This incited the Virgin Fest Entities to insist on aggressive, risk-allocating terms.[15] To that end, the transaction was renegotiated to provide assignment of additional KAABOO assets in exchange for a more elaborate event management scheme,[16] and to convey non-voting Investco stock to the KAABOO Entities.[17] The parties memorialized these and other LOI terms in a barrage of interrelated agreements (collectively, the "Transaction Contracts") to which Investco was not a co-signer.[18]

---

[12]   *Id.* ¶ 41.

[13]   *Id.* ¶¶ 42-43.

[14]   *Id.* ¶ 45.

[15]   *Id.* ¶¶ 47-48.

[16]   *Id.*

[17]   *Id.* ¶ 49.

[18]   *Id.* ¶¶ 59-71.

But, the deals didn't close as planned.[19] The Virgin Fest Entities failed to obtain funding necessary for consummating the acquisition, which in turn made the KAABOO Entities miss payments to trade creditors who were threatening to cease preparations.[20] Nevertheless, the closing was rescheduled to the festival's eve.[21] But too, on that day, the KAABOO Entities received another serving of hard times and hard dealing.[22] The Virgin Fest Entities announced that third-party financing had fallen through and thus insisted on more onerous terms, including a personal guarantee from one of the KAABOO Entities' directors.[23] When the dust settled, the transactions had been completed and virtually all of the KAABOO Entities' assets were sold.[24]

The show would go on, however.[25] About a week after closing, the Virgin Fest Entities began requesting uncompensated services from the KAABOO Entities not contemplated by their agreements.[26] The Virgin Fest Entities also took issue

---

[19]   *Id.* ¶ 53.

[20]   *Id.* ¶¶ 53-54.

[21]   *Id.* ¶ 58.

[22]   *Id.* ¶¶ 55-57.

[23]   *Id.*

[24]   *Id.* ¶ 58.

[25]   *Id.* ¶¶ 72-84.

[26]   *Id.* ¶¶ 72-73.

with employee layoffs and staffing changes without expressing an interest in those matters before.[27] The crescendo: the Virgin Fest Entities questioned the KAABOO Entities' exposure, asserting that the latter omitted integral liabilities from their balance sheets when conducting due diligence.[28] Most of these objections were lodged in a written demand, which the KAABOO Entities construed as a repudiation of the parties' bargain.[29] Out of that interpretation the subject of Motion I grows.

And now, the other version.

## B. MOTION II'S ALLEGATIONS – THE VIRGIN FEST VIEW.

On March 16, 2016, Gordon and Wolkov, the founders of KAABOO, met with Felts, the founder of Virgin Produced ("VP"), to discuss the prospect of a deeper foray into the entertainment industry.[30] Gordon thought his expertise on corporate governance complemented Felts's marketing knowledge—a combination Gordon believed would be advantageous to both firms.[31] After this initial meeting,

---

[27] *Id.* ¶¶ 74-76.

[28] *Id.* ¶¶ 80-81.

[29] *Id.* ¶ 77.

[30] The Virgin Fest Entities' Complaint ¶¶ 42-45 (D.I. 13) ("Virgin Fest Compl.").

[31] *Id.* ¶¶ 42-43.

Gordon became the controlling stockholder of VP and Felts took a position on KAABOO's board.[32]

In the summer of 2018, Felts proposed a partnership between the Virgin Fest and KAABOO Entities. Gordon accepted.[33] The deal conveyed 50-50 equity in Virgin Fest, LLC to Gordon and Felts.[34] Gordon stood as a manager of both the KAABOO Entities and Virgin Fest, LLC after closing.[35] Wolkov remained solely with the KAABOO Entities.[36] And Walker became the KAABOO Entities' Chief Financial Officer.[37]

Around September 2018, the parties brainstormed fundraising ideas for lifting the groups off of the ground.[38] Felts suggested a courtship of Marc Hagle and his wife, two affluent benefactors.[39] Gordon did secure capital and ownership interests

---

[32]   *Id.* ¶¶ 44-45.

[33]   *Id.* ¶ 46.

[34]   *Id.*

[35]   *Id.*

[36]   *Id.*

[37]   *Id.*

[38]   *Id.* ¶¶ 47-49.

[39]   *Id.*

from Hagle by pitching KAABOO's success.[40]  But, as it turned out, he did so by inflating his pitch with false records.[41]

The KAABOO Entities soon began spiraling downward.  In February 2019, KAABOO Cayman co-hosted a festival with the Dart Group that produced an appreciable loss.[42]  Gordon assured investors that the event was funded with equity.[43]  In fact, it was funded with debt evidenced by promissory notes tying the KAABOO Entities to the festival's entire $1.8 million balance.[44]

The Managers concealed the impact of these and other losses from Felts and Hagle when, in June 2019, Gordon invited the Virgin Fest Entities to buy the KAABOO Cayman festival without mentioning its poor health.[45]  When Hagle asked Gordon to provide financial records to aid in evaluating the proposal, Gordon declined and focused on the KAABOO Entities' long-term gains.[46]  When pushed

---

[40]    *Id.*

[41]    *Id.*

[42]    *Id.* ¶¶ 50-51.

[43]    *Id.*

[44]    *Id.*

[45]    *Id.* ¶¶ 52-53.

[46]    *Id.*

further, Gordon noted "leasing" problems with the Dart Group, abandoned the concept and devised a different one.[47]

In the summer of 2019, Gordon told Felts and Hagle that the Virgin Fest Entities should acquire the Del Mar festival because Gordon was no longer interested in owning it.[48] During a June 24, 2019 meeting, the Managers presented records—prepared mostly by Walker—representing that the Del Mar festival generated $24.5 million in gross receipts, turned a $275,000 profit and had unencumbered cash flow.[49] But, the records were based on projections, rather than current standing, and questionable valuation assumptions (*e.g.*, there would be no production costs to the festival going forward).[50] The records also reflected that Gordon overstated the Del Mar festival's goodwill.[51] According to interested buyers, the festival was worth no more than $6.5 million, though Gordon said it was worth at least $20 million.[52]

Citing a conflict of interest, Gordon left the KAABOO Entities' side of the table to Wolkov, who continued negotiations with Felts and Hagle.[53] But Gordon

---

[47]     *Id.* ¶¶ 53-54.

[48]     *Id.* ¶ 54.

[49]     *Id.* ¶¶ 55-60.

[50]     *Id.*

[51]     *Id.*

[52]     *Id.*

[53]     *Id.*

still participated in drafting the parties' non-binding LOI. On August 13, 2019, about one month before the Del Mar festival, the parties nearly finalized the LOI. It provided for the Virgin Fest Entities' potential acquisition of the Del Mar festival, two KAABOO startups and all of the KAABOO Entities' tangible and intangible assets.[54] At this time, Gordon also demanded the Virgin Fest Entities place a $2 million deposit to finance the Del Mar festival's overhead.[55] The Virgin Fest Entities paid the deposit on the condition that it be recouped from the festival's proceeds.[56] But the Managers siphoned that capital out of the KAABOO Entities and didn't pay its creditors or the Virgin Fest Entities.[57]

On September 4, 2019, and with time of the essence, Gordon then urged the Virgin Fest Entities to pay $6.5 million to cover additional expenses.[58] Gordon assured the Virgin Fest Entities the increase would be a short-term loan repayable once Gordon secured capital from Fortress, a private equity firm.[59] Gordon did not allow any Virgin Fest Entities to contact Fortress on the parties' behalves.[60] Gordon

---

[54]    *Id.* ¶¶ 61-63.

[55]    *Id.* ¶ 64.

[56]    *Id.* ¶¶ 64-65.

[57]    *Id.* ¶¶ 89, 212-13.

[58]    *Id.* ¶¶ 66-67.

[59]    *Id.* ¶ 67.

[60]    *Id.* ¶ 69.

further stated that Fortress would supply versatile debt that could be readily converted into equity.[61]   Coupled with the Virgin Fest Entities' immediate investment, Gordon insisted that no suppliers would be left unpaid.[62]   But Gordon never obtained convertible securities and none of the vendors was paid.[63]

On September 12, 2019, the Virgin Fest Entities accepted most of the LOI's terms by relying on budgets and pro-forma documents provided by the Managers during due diligence.[64]   Too, on that day, the parties entered into the Transaction Contracts.[65]   One of these Contracts was the Asset Purchase Agreement ("APA").[66] It was signed by the Virgin Fest Entities, the KAABOO Entities (through Wolkov), and Gordon personally, and specified the transfer of assets from the KAABOO to the Virgin Fest Entities.[67]   In the APA, the KAABOO Entities represented that they had disclosed all material liabilities in their organizational family.[68]   This

---

[61]   *Id.* ¶ 67.

[62]   *Id.*

[63]   *Id.* ¶¶ 70-71.

[64]   *Id.* ¶¶ 72-73.

[65]   *Id.* ¶¶ 74-83.

[66]   *Id.* ¶¶ 76-77.

[67]   *Id.*  Investco did not sign the APA.

[68]   *Id.*

representation was the APA's linchpin, as the Virgin Fest Entities never agreed to purchase junk assets.[69] The APA also had no anti-reliance provision; so the Virgin Fest Entities never second-guessed the KAABOO Entities' documents.[70]

The KAABOO Entities apparently lied about their exposure. Immediately after closing, the Virgin Fest Entities discovered undisclosed liabilities that the Managers concealed during negotiations and omitted in due diligence, including:

1) unpaid bills from dozens of Del Mar festival creditors now seeking to attach the Virgin Fest Entities' newly-owned assets;

2) an active lawsuit against some KAABOO Entities, in which the Virgin Fest Entities were named subsequently as fraudulent transferees;

3) a breached lease of public land that was under investigation by the California Attorney General's Office;

4) the outstanding $1.8 million debt from the Cayman festival;

5) an outstanding $4 million debt from a KAABOO Texas festival; and

6) at least four other active lawsuits brought by former constiuents and counterparties against the KAABOO Entities.[71]

---

[69] *Id.*

[70] *Id.*

[71] *Id.* ¶¶ 85-86, 89, 138-67.

The Virgin Fest Entities communicated their concerns to the KAABOO Entities, which the latter interpreted as a breach of the Transaction Contracts.[72]  In due course, the KAABOO Entities sued.  The Virgin Fest Entities answered with the suite of fraud-based counterclaims pertinent to Motion II.

## C. THE CLAIMS FACING THE MUSIC.

### 1. Motion I – Tortious Interference with Contractual Relations.

The KAABOO Entities bring three claims, but only one is relevant here— tortious interference with contractual relations.[73]   In that count and based on the facts recited above, they allege Investco "intentionally and without justification interfered" with their contracts through its "direct control" over the Virgin Fest Entities stemming from its status as the managing member of their sole owner.[74] Investco responds with a 12(b)(6) dismissal motion,[75] asserting the count fails to state a claim because of a privilege to participate "justifiably" in its affiliates' business affairs free of tort liability.[76]

---

[72]   KAABOO Compl. ¶ 94.

[73]   *Id.* ¶¶ 93-98.

[74]   *Id.* ¶¶ 96-97.

[75]   Investco Motion to Dismiss (D.I. 14).

[76]   *See generally* Investco Opening Brief (D.I. 15).

### 2. Motion II – Extra-Contractual Fraud, Intra-Contractual Fraud & Civil Conspiracy to Commit Fraud.

In their ninth counterclaim and based on the pre-closing conduct recounted above, the Virgin Fest Entities allege the Managers committed extra-contractual common law fraud, fraudulent inducement, fraudulent misrepresentation and fraudulent concealment.[77]  Specifically, they claim:

1) Gordon intentionally concealed the KAABOO Entities' impaired financials to coax the Virgin Fest Entities into believing the deal would be liability-free;

2) Gordon misled the Virgin Fest Entities about his purpose in selling the assets, which was not due to his lack of interest in owning them, but rather was due to their underperformance and exposure to undisclosed liabilities;

3) The Managers provided incomplete and future-oriented valuation data to obfuscate or totally hide present losses;

4) Gordon informed the Virgin Fest Entities falsely that the additional $6.5 million fee would cover all vendor bills;

5) Gordon misled the Virgin Fest Entities into believing he would obtain convertible debt from Fortress to assist in reducing their expenses;

6) Gordon failed to inform the Virgin Fest Entities that the purchase price would not cover all current liabilities;

7) The Managers concealed the numerous claims against the KAABOO Entities to which the Virgin Fest Entities became exposed after closing;

8) Walker, as the KAABOO Entities' CFO, aided Gordon and Wolkov in providing whitewashed financial statements to the Virgin Fest Entities;

---

[77]    Virgin Fest Compl. ¶¶ 206-18.

9) The Managers misappropriated the Virgin Fest Entities' $2 million down payment; and

10) The Managers conducted thin due diligence so the Virgin Fest Entities would accept the KAABOO Entities' representations despite their falsity.[78]

In their tenth counterclaim and based on the pre-closing conduct recounted above, the Virgin Fest Entities allege Gordon and Wolkov committed intra-contractual "Fraud" as defined by the APA.[79] In claiming so, they restate the allegations asserted in their ninth counterclaim.

Finally, in their eleventh counterclaim and based on the pre-closing conduct recounted above, the Virgin Fest Entities allege the Managers conspired to defraud them.[80] In claiming so, they restate the allegations asserted in their ninth counterclaim.

Like their adversary, the KAABOO Entities and Managers respond with a 12(b)(6) dismissal motion,[81] arguing these counterclaims are barred by the APA's terms and in any event fail to allege fraud with Rule 9(b) particularity.[82]

---

[78] *Id.*

[79] *Id.* ¶¶ 219-25.

[80] *Id.* ¶¶ 226-30.

[81] *See* KAABOO Motion to Dismiss (D.I. 103).

[82] *See generally* KAABOO and Managers' Opening Brief (D.I. 104) ("KAABOO & Managers Op. Br.")

## III. LEGAL STANDARD

"The standard of review on a motion to dismiss is derived from Superior Court Civil Rule 12(b)(6), which provides" that a party may so move "if the claimant fails 'to state a claim upon which relief can be granted.'"[83]  In considering a motion to dismiss, the Court must: "(1) accept all well pleaded factual allegations as true, (2) accept even vague allegations as 'well pleaded' if they give the opposing party notice of the claim, (3) draw all reasonable inferences in favor of the non-moving party, and (4) [not dismiss the claim] unless the [claimant] would not be entitled to recover under any reasonably conceivable set of circumstances."[84]

But the benefits of liberal construction afforded a non-movant do not extend to "conclusory allegations that lack specific supporting factual allegations."[85] Indeed, the Court "is not required to accept every strained interpretation of the allegations" a non-movant proposes.[86]  And so, the Court will dismiss if the non-movant fails to plead specific allegations supporting an element of its claim or where

---

[83]   *Brightstar Corp. v. PCS Wireless, LLC*, 2019 WL 3714917, at \*2 (Del. Super. Ct. Aug. 7, 2019) (quoting Super. Ct. Civ. R. 12(b)(6)).

[84]   *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 535 (Del. 2011).

[85]   *Ramunno v. Cawley*, 705 A.2d 1029, 1034 (Del. 1998).

[86]   *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001).

no reasonable, *i.e.*, unstrained, interpretation of the facts alleged reveals a remediable injury.[87]

## IV. DISCUSSION

### A. TORTIOUS INTERFERENCE AND THE AFFILIATE PRIVILEGE (MOTION I).

"Under Delaware law, the elements of a claim for tortious interference with a contract are: '(1) a contract, (2) about which defendant knew, and (3) an intentional act that is a significant factor in causing the breach of such contract, (4) without justification, (5) which causes injury.'"[88]  This claim mixes two carefully-distilled species of liability—contract and tort—and could frustrate sophisticated counterparties' efforts to "order their affairs and bargain for specific results."[89]  Delaware law "elevates contract law over tort" in the business context and prefers damages due from a breach be calculated, whenever possible, by the "predictability of the parties' agreement," rather than through the fiat of a "far less

---

[87]  *Brightstar*, 2019 WL 3714917, at *3 (citing *Otto Candies, LLC v. KPMG LLP*, 2018 WL 1960344, at *3 (Del. Super. Ct. Apr. 25, 2018)).

[88]  *Bhole, Inc. v. Shore Invs., Inc.*, 67 A.3d 444, 453 (Del. 2013) (quoting *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)).  The affiliate privilege doctrine undermines the "justification" element. *See, e.g.*, *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 589 (Del. Ch. 1994).  Accordingly, if it applies, then it is claim-dispositive. *See Brightstar*, 2019 WL 3714917, at *3 (observing that dismissal is warranted if the complaint fails to demonstrate specific facts "supporting an element of [a] claim" (citing *Otto Candies*, 2018 WL 1960344, at *3)).

[89]  *NACCO Indus., Inc. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009).

certain, after-the-fact, judicially-fashioned tort remedy."[90] As a result, Delaware courts "have tended to narrowly circumscribe the scope" of tortious interference claims to avoid "chilling third parties from competing for business in any marketplace in which existing contracts obtain."[91]

The affiliate or "interference" privilege evolved from these principles and serves to minimize the risk of deterring intrafirm consultation on matters of commercial significance.[92] The privilege supplies a defense to overbroad attacks on the "justification" for a controller's involvement with its affiliates' contracts that might otherwise convert any of the controller's business judgments into personal guarantees.[93] Indeed, it is primarily those scattergun approaches that ignore the legal distinctness inherent to the corporate personality that the privilege unloads.[94] And

---

[90] *Id.*

[91] *Shearin*, 652 A.2d at 589.

[92] *See id.* at 589-91.

[93] *Id.* at 589 (explaining claims of "improper" interference "inevitably involve a complex normative judgment relating to" the justification element (internal quotation marks omitted)); *see Bandera Master Fund LP v. Boardwalk Pipeline Partners, LP*, 2019 WL 4927053, at *25 (Del. Ch. Oct. 7, 2019) ("The tort of interference with contractual relations is intended to protect a promisee's economic interest in the performance of a contract by making actionable improper interference with the promisor's performance. The adjective 'improper' is critical. For participants in a competitive capitalist economy, some types of intentional interference are a legitimate part of doing business." (internal quotation marks omitted)); *see also Renco Grp., Inc. v. MacAndrews AMG Holdings LLC*, 2015 WL 394011, at *9 (Del. Ch. Jan. 29, 2015) ("[A] party to a contract cannot interfere with its own contractual relations, and affiliates can be understood to share that contractual interest." (citation omitted)).

[94] *See, e.g.*, *Renco*, 2015 WL 394011, at *9 (rejecting a tortious interference claim on affiliate privilege grounds and observing "[t]he standard for finding liability for controllers must be high

-19-

so, in accord therewith, Delaware courts will "balance the important policies served by a claim for tortious interference with contract against the similarly important policies served by the corporate form" when evaluating whether a controller's interference was "unjustified."[95]

That balance is struck to prevent tortious interference claims from doubling as backdoor *respondeat superior* theories (by imputing tort liability to controller entities for the contractual breaches of controlled entities) or blunt instruments for piercing the corporate veil (by deeming controller and controlled contractual equivalents).[96] Delaware courts do not lightly impose such liability or disregard entity separateness.[97] Rather, they expect that counterparties will do so bilaterally if

---

or everyday consultation or direction between parent corporations and subsidiaries about contractual implementation would lead parents to be always brought into breach of contract cases" (internal quotation marks omitted)).

[95] *Bandera*, 2019 WL 4927053, at *26; *see Shearin*, 652 A.2d at 591 (observing that intra-firm "interference" is not necessarily improper (citation omitted)); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 667 (Del. Ch. 2012) ("[T]he separate legal existence of juridical entities is fundamental to Delaware law.").

[96] *See, e.g.*, *Otto Candies, LLC v. KPMG, LLP*, 2020 WL 4917596, at *9-13 (Del. Ch. Aug. 21, 2020) (discussing with nuance the relationship between agency law and veil piercing and the ways in which vicarious liability in tort and contract differ from direct liability in veil piercing).

[97] *See, e.g.*, *id.* at *9 (beginning veil-piercing and vicarious liability analysis with recognition of "the fundamental premise that under ordinary circumstances, one entity will not be held responsible for the actions of another" (citation omitted)); *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018) ("[A] true novelty would be to disregard the separateness of a parent and a subsidiary simply because a plaintiff would prefer to hold both liable for the subsidiary's breach of contract. Our law does not countenance this result."); *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) ("Persuading a Delaware court to disregard the corporate entity is a difficult task." (internal quotation marks omitted)).

they wish.[98]   Accordingly, where, as here, there is no contractual mechanism for holding a non-party controller responsible for the controlled's breaches, a complaint must contain "alleged *facts* to rebut the presumption"[99] that the controller was "pursuing its legitimate profit seeking" interests "in good faith"[100]—*i.e.*, by showing that the controller's "*sole* motive"[101] in interfering was "bad faith to injure plaintiff."[102]   Otherwise, the privilege protects the controller from primary or vicarious tort liability for the breach of a contract connected to its enterprise but to which the controller itself was not a signatory.[103]

So the issues before the Court are twofold: (1) the threshold question of whether Investco is "affiliated" with the Virgin Fest Entities and thus can invoke the

---

[98]   *See, e.g.*, *Bandera*, 2019 WL 4927053, at *26 ("A party who wishes to have a parent entity or other controller backstop the obligations of the controlled entity can do so by contract, either by making the parent a party to the agreement or by obtaining a guarantee.  A party should not be able to use a claim of tortious interference with contract to reap the benefits of protections that it did not obtain at the bargaining table.").

[99]   *Renco*, 2015 WL 394011, at *9 (emphasis in original).

[100]   *Shearin*, 652 A.2d at 591.

[101]   *WaveDivision Holdings, LLC v. Highland Cap. Mgmt., L.P.*, 49 A.3d 1168, 1174 (Del. 2012) (emphasis in original).

[102]   *Bhole*, 67 A.3d at 453.

[103]   *Id.*; *see Shearin*, 652 A.2d at 591 ("[T]here can be no non-contractual liability to the affiliated corporation, which is privileged to consult and counsel with its affiliates, unless the plaintiff pleads . . . the affiliate sought not to achieve permissible financial goals but sought maliciously or in bad faith to injure plaintiff.").

privilege; and (2) the follow-up question of whether the KAABOO Entities have alleged bad faith sufficient to nevertheless prevent the privilege's invocation.

### 1. Investco is an "Affiliate" of the Virgin Fest Entities.

Parent companies are affiliated with their subsidiaries.[104] Likewise, two commonly-owned entities are affiliates.[105] Too, the privilege applies whenever the alleged tortfeasor "controls an entity that was a party to the contract"[106] or "share[s] [a] common economic interest[] with a party to the contract."[107] Here, the KAABOO Entities allege Investco is the sole manager of Virgin Fest, LLC—"a party to the contract" that wholly owns the other two Virgin Fest Entities. They have, therefore, pleaded Investco's "control" over all affiliated parties alleged to be in breach.[108]

Struggling in opposition, the KAABOO Entities try to cabin the affiliate privilege to "the parent-subsidiary corporate relationship" by arguing Investco—a managing member of a parent *LLC* that wholly owns the other two contracting

---

[104] *See Shearin*, 652 A.2d at 590 & n.14.

[105] *See James Cable, LLC v. Millenium Digit. Media Sys., L.L.C.*, 2009 WL 1638634, at *4-5 (Del. Ch. June 11, 2009).

[106] *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *26 (Del. Ch. Nov. 17, 2014).

[107] *Skye Min. Invs., LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *33 (Del. Ch. Feb. 24, 2020) (internal quotation marks omitted).

[108] *NAMA Holdings*, 2014 WL 6436647, at *26.

companies—cannot invoke the privilege.[109]  But this distinction is meritless.  As the Court of Chancery explained, "the relationship among wholly owned affiliates with a common parent is no different . . . than that between a parent and a subsidiary [because] such entities share the commonality of economic interests which underlay the creation of an interference privilege."[110]  The KAABOO Entities offer no principled basis, in law or in the facts they've alleged, to depart from this long- and well-understood principle conclusion and to treat LLCs less favorably than corporations.

## 2. The Allegations are Devoid of Investco's Bad Faith.

Recall that the complaint must "allege[] *facts*"[111] showing Investco's interference was unjustified—a meddling motivated not by legitimate economic goals, but with bad faith to injure the KAABOO Entities.[112]  This the complaint fails to do.  The KAABOO Entities allege no actions Investco took to interfere with their contracts, let alone "malicious" ones.[113]  Indeed, the references to Investco in the

---

[109]  KAABOO Answering Brief at 13-15 (D.I. 27) ("KAABOO Ans. Br.").

[110]  *See Shearin*, 652 A.2d at 590 n.14.

[111]  *Renco*, 2015 WL 394011, at *9 (emphasis in original).

[112]  *See Bhole*, 67 A.3d at 453; *Shearin*, 652 A.2d at 591; *see also WaveDivision*, 49 A.3d at 1174 ("The defense of justification does not require that the defendant's proper motive be its sole or even its predominate motive for interfering with the contract.  Only if the defendant's *sole* motive was to interfere" should a court find "improper interference" (emphasis in original)).

[113]  *See Bhole*, 67 A.3d at 453.

complaint identify the circumstances of Investco's formation[114] and describe the parties' use of an ownership stake in Investco as consideration for their various agreements.[115] And so, the only obvious nexus from the alleged breach to Investco is that Investco is the controlling member of one breaching party that owns the others—precisely the type of residual liability the privilege eliminates and Delaware law plainly rejects.[116]

To bolster their deficient pleadings, the KAABOO Entities speculate that Investco may have caused the Virgin Fest Entities to become financially unable to honor their duties to pay.[117] Though this type of wrongdoing could be sufficient to overcome the privilege,[118] the complaint must explain how Investco "both induced a breach of contract *and* rendered [the Virgin Fest Entities] unable to satisfy [their] contractual obligations"[119] to do so. The complaint just doesn't.

---

[114] KAABOO Compl. ¶¶ 30-34.

[115] *Id*. ¶¶ 49, 56, 57, 63, 84.

[116] *See, e.g.*, *Wenske*, 2018 WL 5994971, at *5; *Shearin*, 652 A.2d at 591.

[117] KAABOO Ans. Br. at 22.

[118] *See, e.g.*, *AM Gen. Holdings LLC v. Renco Grp., Inc.*, 2013 WL 5863010, at *13 (Del. Ch. Oct. 31, 2013) ("In those cases where Delaware courts found that an alleged tortfeasor acted in bad faith after it was found to qualify for the limited affiliate exception, plaintiffs pleaded facts alleging that the tortfeasor had shifted the debtor entity's assets such that the entity was insolvent and could not satisfy its obligations to the creditor plaintiff." (citations omitted)).

[119] *NAMA Holdings*, 2014 WL 6436647, at *30 (emphasis added).

The bare assumption that Investco, as controller of Virgin Fest, LLC, must have commanded the breach is a conclusory supposition, not a specific fact from which an inference of impropriety may be properly drawn.[120] Nor does the muted assertion that Investco "intentionally and without justification interfered" with the transactions indite any instances of misconduct.[121]

Those cases on which the KAABOO Entities rely all involved insolvent breaching parties in which a controlling entity *was alleged* to have forced their insolvency by siphoning the breaching parties' assets and arrogating those assets to itself.[122] But here, their allegations lead only to a conclusion that the Virgin Fest Entities have breached the Transaction Contracts, not that Investco extracted value from them to force their insolvency and thus induce their non-performance.[123]

---

[120]  KAABOO Compl. ¶¶ 96-97; *see Ramunno*, 705 A.2d at 1034 (Court "ignore[s] conclusory allegations that lack specific supporting factual allegations" when assessing dismissal motions).

[121]  KAABOO Compl. ¶¶ 96-97; *see Malpiede*, 780 A.2d at 1083 (Court not required to "accept every strained interpretation of the allegations" when assessing dismissal motions).

[122]  *See PPL Corp. v. Riverstone Holdings LLC*, 2019 WL 5423306, at *13 (Del. Ch. Oct. 23, 2019) ("[I]t is well-pled here that [defendant] use[d] its control of a subsidiary, not to enrich the subsidiary, but to divert value from the subsidiary to itself in a bad faith manner." (internal quotation marks omitted)); *WP Devon Assocs., L.P. v. Hartstrings, LLC*, 2012 WL 3060513, at *4 (Del. Super. Ct. July 26, 2012) (plaintiff met its burden by pleading parent caused subsidiary to "sell substantially all of its operating assets," which left it without capital to make payments under the subject agreements (internal quotation marks omitted)).

[123]  *Cf. Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1024 (Del. Ch. 2006); *PPL Corp.*, 2019 WL 5423306, at *13; *AM Gen. Holdings*, 2013 WL 5863010, at *13; *WP Devon Assocs.,* 2012 WL 3060513, at *4.

As the "master[s] of the [their] complaint,"[124] the KAABOO Entities could have pursued other avenues to reach Investco. Certain allegations in the complaint sound of the outrageousness that might lead a fact finder to genres of action bringing Investco extra-contractual liability. Having not pleaded them, though, those causes of action are not in the case, and the tortious interference claim, by itself, is a tune without a hook. Even if the Court engaged a "strained interpretation" of the complaint's Investco-targeted allegations,[125] it would find they present nothing more than a *respondeat superior* or veil-piercing attempt to collapse an LLC into its legally-separate manager. This Delaware law does not allow. Accordingly, the KAABOO Entities fail to plead bad faith sufficient to overcome the privilege and the tortious interference claim must be silenced here.

## B. THE APA'S "LIMITATIONS" ON FRAUD CLAIMS (MOTION II).

In order to address the Virgin Fest Entities' fraud-based counterclaims, the Court must first decide whether they contracted-away their right to bring them. The parties agree there are only two terms in the APA that potentially limit fraud liability: Section 7.15 (the "No Recourse Provision") and Section 6.06 (the "Exclusive Remedies Provision").

---

[124] *Halpern Fam. Prop. Invs., L.P. v. Anderson*, 2011 WL 3568342, at *1 (Del. Super. Ct. June 13, 2011).

[125] *But see Malpiede*, 780 A.2d at 1083 (relieving courts of the pain of such interpretive straining).

The "No Recourse Provision" declares –

> All claims or causes of action (whether in contract or in tort, or in law or in equity) that may be based upon, arise out of or relate to this Agreement or any other Transaction Document, or the negotiation, execution or performance of this Agreement or any other Transaction Document, may be made only against (and subject to the terms and conditions thereof) the entities that are expressly identified as parties hereto and *no individual officer or signatory on behalf of such parties shall have any personal liability or liabilities arising under, in connection with or related to this Agreement or any other Transaction Document.*[126]

And the Exclusive Remedies Provision declares –

> The Parties hereby agree that, from and after the Closing Date, the indemnification provisions set forth in this Article VI are the exclusive provisions in this Agreement with respect to the liability of Sellers and Buyers for the breach, inaccuracy or nonfulfillment of any representation or warranty or any covenants, agreements or obligations contained in this Agreement and the sole remedy of the Buyer Indemnified Parties and the Seller Indemnified Parties for any claims for breach of representation or warranty or covenants, agreements or other obligations arising out of this Agreement or any Law or legal theory applicable thereto; provided that nothing herein shall (a) preclude any Party from seeking any remedy against any Person based upon Fraud by any other Party *(including any Fraud by an officer or manager of any Seller or Buyer in connection with the consummation of the transactions contemplated by this Agreement)*. . . .[127]

---

[126]  Asset Purchase Agreement § 7.02 (D.I. 42) (emphasis added) (hereinafter "APA").

[127]  *Id.* (emphasis added).

They do not agree, though, on the Provisions' meanings. The KAABOO Entities and Managers contend the No Recourse Provision "overrides" the Exclusive Remedies Provision and precludes suits against the Managers in fraud.[128] For their part, the Virgin Fest Entities argue the No Recourse Provision is unenforceable as-applied to fraud and add that the Exclusive Remedies Provision, the "more specific" Provision, controls anyway.[129] In confronting this discord, the Court employs familiar instruments to harmonize both Provisions.

**1. Plain Meaning Analysis Governs the APA Interpretation Dispute.**

Under Delaware law, "[t]he proper construction of any contract is purely a question of law."[130] "The objective [of interpretation] is to give full effect to the parties' mutual intent at the time of contracting."[131] In respecting that mutual intent, the Court "read[s] a contract as a whole and . . . give[s] each provision and term [purpose], so as not to render any part of the contract" superfluous.[132] And "[w]hen the contract is clear and unambiguous," the Court "give[s] full effect to the plain-

---

[128] KAABOO & Managers Op. Br. at 15-17.

[129] Virgin Fest Entities' Answering Brief at 2-14 (D.I. 105) ("Virgin Fest Ans. Br.").

[130] *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266-67 (Del. 2017).

[131] *Bobcat N. Am., LLC v. Inland Waste Holdings, LLC*, 2019 WL 1877400, at *5 (Del. Super. Ct. Apr. 26, 2019) (citing *Exelon*, 176 A.3d at 1263); *see Salamone v. Gorman*, 106 A.3d 354, 367-68 (Del. 2014).

[132] *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010).

meaning of the contract's . . . provisions."[133] But, a contract is not ambiguous merely because the parties advance opposing reads.[134] Ambiguity exists *only* when disputed provisions are "fairly or reasonably susceptible to more than one meaning."[135]

### 2. The APA Does Not Bar Fraud Claims Against the Managers.

A natural reading of the No Recourse Provision is that directors and officers are not personally liable for claims brought "arising under" or "relating to" the APA.[136] In other words, as the Provision's title makes clear, the Virgin Fest Entities have "no recourse" to the Managers, personally or in their managerial capacities, for grievances connected in any way to the deal.[137] Indeed, the Court need not look far to confirm the parties' intent on this point. Merely one section later, Gordon agreed to personally guarantee payment of excess liabilities incurred by the Del Mar festival.[138] If the No Recourse Provision did not protect managers from personal

---

[133]  *Hallisey v. Artic Intermediate, LLC*, 2020 WL 6438990, at *3 (Del. Ch. Oct. 29, 2020) (internal quotation marks omitted).

[134]  *Bobcat*, 2019 WL 1877400, at *5 (citing *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012)).

[135]  *Alta Berkeley*, 41 A.3d at 385.

[136]  *See* APA § 7.15.

[137]  *Id.* (titled "No Recourse" and limiting claims to those against "the entities that are expressly identified as parties," for which "individual officer[s]" have no "personal liability").

[138]  *See* APA § 7.16 (titled the "Gordon Guarantee").

liability for the KAABOO Entities' unsatisfied debts, then why include a redundant personal guarantee?[139]

Acknowledging this, the Virgin Fest Entities turn back to the Exclusive Remedies Provision, which they say is a chink in the bulletproof armor the Managers don in the No Recourse Provision.[140] This "exception"-based rationale makes sense. The Exclusive Remedies Provision unambiguously declares nothing "herein"—*i.e.*, in the APA as whole—negates claims of "[f]raud by an officer or manager" of the KAABOO Entities, regardless of "Party" status.[141] So, while the parties generally agreed the No Recourse Provision would bar "tort" claims against the Managers, they also expressly agreed the APA would not bar the bringing of fraud claims.[142] They could not have contracted otherwise. Delaware courts refuse to enforce

---

[139] *See Kuhn*, 990 A.2d at 396-97 (directing courts to interpret contracts in a manner harmonizing all provisions).

[140] *See, e.g.*, Virgin Fest Ans. Br. at 6-10.

[141] APA § 6.06 (making actionable "Fraud" "by any other Party (including any Fraud by an officer or manager of any Seller or Buyer in connection with the consummation of the transactions contemplated by this Agreement)"). The failure to capitalize "officer" and "manager" indicates that non-Parties and non-signatories were intended to be captured. *See, e.g.*, *Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, 2015 WL 3863245, at *5 (Del. Super. Ct. June 10, 2015) (refusing to "ignore that the plain language . . . [did] not include the capitalized term[s]" defendant sought to insert and declining to "add[] a . . . restriction not found in the plain language").

[142] *Compare* APA § 7.15 *with id.* §§ 6.04 (defining fraud in a manner substantively indistinguishable from the common law), 6.06 (permitting fraud lawsuits).

contracts purporting to condone—or at least insulate—intentional fraud.[143]

Accordingly, the APA blocks the Managers' escape from fraud claims.

To press their wobbly construct, the KAABOO Entities and Managers pretend the "any officer or manager" language doesn't exist.[144] But that read is ruinous to their constructions, which render meaningless the carve-out for managerial fraud—an outcome clearly contrary to the parties' mutual intent.[145] For nearly the same reason, their stingy view of the word "herein" doesn't persuade.[146] If the "herein" clause were confined to "Article VI", then either the broad immunity offered by the

---

[143] *See, e.g.*, *Simons v. Cogan*, 549 A.2d 300, 303 (Del. 1988); *Harff v. Kerkorian*, 347 A.2d 133, 134 (Del. 1975) (per curiam); *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1036 (Del. Ch. 2006); *Mabon, Nugent & Co. v. Tex. Am. Energy Corp.*, 1988 WL 5492, at *3 (Del. Ch. Jan. 27, 1988); *Cont'l Ill. Nat'l Bank & Trust Co. of Chi. v. Hunt Int'l Res. Corp.*, 1987 WL 55826, at *5-6 (Del. Ch. Feb. 27, 1987); *see also Quadrant Structured Prods. Co., Ltd. v. Vertin*, 106 A.3d 992, 1016-17 (Del. Ch. 2013) (analyzing applicable "no recourse" case law). The KAABOO Entities and Managers protest the force of these cases because many involved interpretation of "indenture" agreements. But whether the parties are bondholders and issuers or targets and acquirers, Delaware courts are indifferent to parties' labels for their transactions when a disclaimer of intentional fraud is concerned. *See, e.g.*, *Airborne Health, Inc. v. Squid Soap, LP*, 984 A.2d 126, 136-37 (Del. Ch. 2009) ("Because of Delaware's strong public policy against intentional fraud, a knowingly false contractual representation can form the basis for a fraud claim, regardless of the degree to which the agreement purports to disclaim or eliminate tort remedies." (citation omitted)).

[144] KAABOO & Managers Op. Br. 15-17 (omitting discussion of the parenthetical language in § 7.15).

[145] *See Sonitrol Holding Co. v. Marceau Invs.*, 607 A.2d 1177, 1183 (Del. 1992) ("[A] contract should be interpreted in such a way as to not render any of its provisions illusory or meaningless" or in a way that "frustrates the meaning, purpose and intent of the parties' agreement." (citations omitted)).

[146] *See KAABOO & Managers Op. Br. at 16-17; KAABOO & Managers Reply Brief at 5-7 (D.I. 106) (arguing the word "herein" means "here [] in" the Exclusive Remedies Provision, which prevents suits against the Managers in fraud).

No Recourse Provision, or the narrow vulnerability reserved by the Exclusive Remedies Provision, would be superfluous.[147]  Delaware law forbids judicial rehabbing of plain language and so the Court will not take up the KAABOO Entities' tool.[148]

## C. RULE 9(B) SCRUTINY OF THE FRAUD COUNTERCLAIMS (MOTION II).

In the absence of contractual barriers to resolving the Virgin Fest Entities' fraud-based counterclaims, the next and final question is whether each of those counts is pleaded with Rule 9(b) particularity.

"Delaware law requires plaintiffs to plead fraud and misrepresentation claims with particularity—a heightened pleading standard."[149]  To satisfy Rule 9(b) and thus repel a 12(b)(6) dismissal motion, the claimant must allege "(1) the time, place, and contents of the false representation; (2) the identity of the person making the representation; and (3) what the person intended to gain by making the

---

[147]  *See Sonitrol*, 607 A.2d at 1183 (directing courts not to interpret an agreement in a manner rendering some or all of their terms meaningless or contradictory).

[148]  *See, e.g.*, *Urdan v. WR Cap. Partners, LLC*, 2020 WL 7223313, at *6 n.17 (Del. Dec. 3, 2020) ("Absent some ambiguity, Delaware courts will not destroy or twist [contractual] language under the guise of construing it." (internal quotation marks omitted)).

[149]  *EZLinks Golf v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *3 (Del. Super. Ct. Mar. 13, 2017) (citing Del. Super. Ct. Civ. R. 9(b)); *see Avve, Inc. v. Upstack Techs., Inc.*, 2019 WL 1643752, at *5 (Del. Super. Ct. Apr. 12, 2019) (observing that Rule 9(b) "deviates from the [short and plain statement ("notice pleading")] rule and imposes a heightened pleading standard for fraud").

representation."[150]  "When the necessary facts are . . . within the opposing party's control," however, "less particularity is required."[151]  As a result, when the allegations upon which the accuser depends are obscured or possessed by the accused, the claim can survive dismissal so long as "the circumstances of the fraud" are drawn "with detail sufficient to apprise the [accused] of the basis for the claim."[152]

### 1. The Fraud and Fraudulent Inducement, Misrepresentation and Concealment Claims are Pleaded with Rule 9(b) Particularity.

The KAABOO Entities and Managers attempt to set these frauds up as a series of hurdles the Virgin Fest Entities must clear.[153]  But Delaware courts reject this course because all fraud claims require proof of the same or nearly the same generic elements.[154]  Put differently, any doctrinal variations inherent to each individual

---

[150]  *EZLinks Golf*, 2017 WL 1312209, at *3 (internal quotation marks omitted); *see Kostysyzn v. Martuscelli*, 2015 WL 721291, at *3 (Del. Super. Ct. Feb. 18, 2015); *Abry Partners*, 891 A.2d at 1049.

[151]  *Brightstar*, 2019 WL 3714917, at *9 (citations omitted).

[152]  *Id.* (internal quotation marks omitted).

[153]  KAABOO & Managers Op. Br. at 17-31.

[154]  *See. e.g.*, *Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. Apr. 3, 2020) ("The elements of fraud and fraudulent inducement are the same."); *see id.* n.339 (acknowledging that it would be "tautological" to repeat an analysis of each fraud claim because the claims incorporate variations of each other's elements).  The KAABOO Entities and Managers tacitly recognize this in parenthetically noting a fraudulent inducement case to support dismissal of the fraudulent concealment counterclaim.  *See* KAABOO & Managers Op. Br. at 21-22 (citing *Acorn USA Holdings, LLC v. Premark Int'l, Inc.*, 2003 WL 22861168 (Del. Super. Ct. July 16, 2003)).

typification of fraud derive either from the nature of the alleged fabrication or the motivation for the alleged deception.[155] That being so, a paradigmatic fraud case requires only:

> (1) a false representation, usually one of fact, made by the defendant;
>
> (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
>
> (3) an intent to induce the plaintiff to act or to refrain from acting;
>
> (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and
>
> (5) damages . . . as a result of such reliance.[156]

The Virgin Fest Entities' modifiers—inducement, misrepresentation and concealment—all concern the first element: "a false representation."[157] A false representation may be "'an overt misrepresentation (*i.e.*, a lie), a deliberate concealment of material facts, or . . . silence in the face of a duty to speak.'"[158] Deliberate concealment has occurred if a defendant "took some action affirmative in nature designed or intended to prevent, and which [did] prevent, the discovery of facts giving rise to the fraud claim[;] some artifice to prevent knowledge of the

---

[155]  *Maverick*, 2020 WL 1655948, at *26

[156]  *Id.*; *see E.I. DuPont de Nemours & Co. v. Fla. Evergreen Foliage*, 744 A.2d 457, 461-62 (Del. 1999).

[157]  *Maverick*, 2020 WL 1655948, at *26.

[158]  *Id.* (quoting *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).

facts[;] or some representation intended to exclude suspicion and prevent inquiry."[159] And a defendant has a duty to speak in the face of which he cannot remain silent "if, before the consummation of a business transaction, [the defendant] acquire[d] information that [he] knows will make untrue or misleading a previous representation that when made was true."[160]

Relatedly, "*scienter* may be demonstrated . . . [by showing] motive and opportunity for the inducement."[161] More important, "[i]n cases where a fraud claim centers on a transaction, the transaction itself may serve as both the motive and the opportunity to commit the fraud."[162] And lastly, reliance is justified in the contractual context where there is no anti-reliance provision,[163] where the plaintiff was reasonably diligent, or where the plaintiff does not share the defendant's understanding of the same essential terms.[164]

---

[159] *Maverick*, 2020 WL 1655948, at *26 (internal quotation marks omitted) (brackets in original); *see Lock v. Schreppler*, 426 A.2d 856, 860 (Del. Super. Ct. 1981).

[160] *Maverick*, 2020 WL 1655948, at *26 (internal quotation marks omitted).

[161] *Id.* at *29.

[162] *Id.*

[163] *See, e.g.*, *Infomedia Grp., Inc. v. Orange Health Sols., Inc.*, 2020 WL 4384087, at *4-5 (Del. Super. Ct. July 31, 2020) (observing that Delaware courts routinely enforce anti-reliance provisions, which preclude a plaintiff from using extra-contractual evidence, including counterparty negotiation statements, to support breach-of-contract and fraud lawsuits).

[164] *See Maverick*, 2020 WL 1655948, at *30-31.

Looking to the Virgin Fest Entities' allegations, it is reasonably conceivable that the Managers' negotiation behavior and other pre-closing initiatives defrauded their counterparties into acquiring a liability-ridden enterprise unawares. In support of their theories, the Virgin Fest Entities marshal these facts, among others, to "apprise the defendant[s] of the basis for the[ir] [counter]claims":[165]

> (1) As early as June 2019, the Managers began presenting financial records to Felts and Hagle which cloaked current liabilities and losses to make the acquisitions appear commercially attractive;[166]
>
> (2) In July 2019, the Managers misrepresented the Del Mar festival's profits and anticipated cash flow and their reasons for selling it to Felts and Hagle by basing budgets on future projections and economically invalid assumptions to hide present debt and litigation exposure;[167]
>
> (3) About 30 days before the Del Mar festival, the Managers represented that the Virgin Fest Entities' $2 million down payment would cover all present liabilities, even though there were current liabilities in excess of that investment and the Managers intended to misdirect the money instead;[168]
>
> (4) On September 4, 2019, Gordon assured the Virgin Fest Entities an additional $6.5 million would cover all vendor bills without revealing the extent to which the KAABOO Entities were indebted to their trade creditors;[169] and

---

[165] *Brightstar*, 2019 WL 3714917, at *9 (internal quotation marks omitted).

[166] *E.g.*, Virgin Fest Compl. ¶¶ 54-60.

[167] *Id.*

[168] *E.g.*, *id.* ¶¶ 61-71, 89, 212-13.

[169] *E.g.*, *id.* ¶¶ 64-67.

(5) Immediately after closing, the Virgin Fest Entities became aware of the various debts incurred by and litigation against the KAABOO Entities, which comprise the current liabilities and losses that were hidden by the untrue accounting and financial records provided and pre-closing statements made.[170]

At this point, these well-pleaded allegations are entitled to truth, which means that material liabilities either were intentionally not disclosed (deliberate concealment) or were starving for correction (breach of the duty to speak) at closing.[171] That also means the Managers could have been motivated by executing the Transaction Contracts right before the 2019 Del Mar festival to cast off responsibility for its upcoming and ongoing expenses.[172] And without an anti-reliance provision or mutual understanding of the same essential terms, it is fair to conclude that the Virgin Fest Entities could not have been expected to ferret out this wrongdoing when the Managers alone possessed the accurate—but withheld—

---

[170]  *E.g.*, *id.* ¶¶ 85-86, 89, 138-67.

[171]  *See, e.g.*, APA § 3.05 ("[N]o Seller has any liabilities related to the Business that are of a nature required to be disclosed on a balance sheet prepared in accordance with generally accepted accounting principles. . . ."); *id* § 3.10 ("[T]o Sellers' Knowledge, no representations or warranties by Sellers in this Agreement . . . contain[] any untrue statement of material fact or, to Sellers' knowledge, omits any material fact necessary to make the statements or facts contained therein not misleading."); *see also Maverick*, 2020 WL 1655948, at *26 (explaining what must be pleaded for fraud liability to attach).

[172]  *Maverick*, 2020 WL 1655948, at *29 (observing that *scienter* may be established in devising the agreement in the first place).

books and balance sheets.[173] In this instance, then, "less particularity" suffices, as the KAABOO Entities and Managers guarded the "necessary facts" on which the counterclaims rest.[174] And so, these claims satisfy Rule 9(b).

Attempting to make nothing out of something, the KAABOO Entities and Managers cherry-pick allegations and characterize them as not clearly false, or as unproblematic future predictions or opinions.[175] But their attempt here comes to naught for at least three reasons. *First*, the Virgin Fest Entities need not *prove* fraud at this stage. Instead, the Court will dismiss only if the allegations do not entitle the Virgin Fest Entities to relief "under any reasonably conceivable set of circumstances."[176] *Second*, the Virgin Fest Entities plead not only false statements, but also deliberate concealment and breach of the duty to speak.[177] And *third*, though some of the Managers' statements might be predictive or opinion-like in form, they

---

[173] *See, e.g.*, *Infomedia*, 2020 WL 4384087, at *4-5; *cf. Maverick*, 2020 WL 1655948, at *30-31 (explaining reliance is not justifiable where the parties do not share the same understanding of the essential terms or the plaintiff is not reasonably diligent (citations omitted)).

[174] *Brightstar*, 2019 WL 3714917, at *9 (citations omitted).

[175] KAABOO & Managers Op. Br. 23-28; *see id.* at 23 ("It is well-settled in Delaware that predictions about the future cannot give rise to actionable common law fraud . . . and nor can expressions of opinion." (citing *WyPie Invs., LLC v. Homschek*, 2018 WL 1581981, at *8 (Del. Super. Ct. Mar. 28, 2018)) (cleaned up))).

[176] *Cent. Mortg.*, 27 A.3d at 535.

[177] *See Maverick*, 2020 WL 1655948, at *-26.

are not in substance.[178]  Here, the Virgin Fest Entities allege the Managers duped them into accepting the KAABOO Entities' assets on terms framed as forward-looking but structured to mask *present* financial ruin.[179]

### 2. The APA "Fraud" Claim is Alleged with Rule 9(b) Particularity.

The tenth counterclaim rings hollow.  The Virgin Fest Entities allege Gordon and Wolkov (who signed on behalf of the KAABOO Entities) have committed "Fraud" as defined by the APA.  The APA defines Fraud as "any false representation, misrepresentation, deceit, or concealment of a fact with the intention to deceive, conceal or otherwise cause injury."[180]  On its own terms, this definition is virtually interchangeable with common law fraud.  Accordingly, it follows that here incantation of the APA's specific "Fraud" verse, pens the Virgin Fest Entities' fraud allegation with requisite Rule 9(b) particularity.

---

[178]  *See Edinburgh Holdings, Inc. v. Educ. Affiliates, Inc.*, 2018 WL 2727542, at *12 (Del. Ch. June 6, 2018) ("[A] promise of future conduct can be actionable in fraud" if the plaintiff "plead[s] specific facts that lead to a reasonable inference that the promisor had no intention of performing at the time the promise was made." (internal quotation marks and emphasis omitted)).

[179]  *See Mooney v. E.I. du Pont de Nemours & Co.*, 2017 WL 5713308, at *6 (Del. Super. Ct. Nov. 28, 2017) (observing that "statements of opinion and predictions about the future," though "usually" not cognizable, may be if "a plaintiff . . . plead[s] circumstances permitting an inference that the defendants 'were positioned to know that they were making erroneous statements of material facts and had an interest in doing so.'" (quoting *Trenwick Am. Litig. Trust v. Ernst & Young, L.L.P.*, 906 A.2d 168, 211 (Del. Ch. 2006))).

[180]  APA § 6.04.

## 3. Conspiracy to Commit Fraud is Alleged with Rule 9(b) Particularity.

In their eleventh counterclaim, the Virgin Fest Entities allege the Managers' deception amounted to a civil conspiracy. The gravamen of their theory is the Managers colluded to hide the KAABOO Entities' liabilities and to glaze the deal with doctored financial records. The KAABOO Entities and Managers argue these allegations falter because the Virgin Fest Entities have not pleaded the existence of an explicit agreement.[181] But at a motion to dismiss stage, Delaware courts require merely "sufficient facts to support an inference that the defendants . . . acted in concert with one another."[182] That is because "a conspiracy can be inferred from the pled behavior of the alleged conspirators."[183] Here, it is not plausible that the Managers acted without choreography. Given their concert in drafting the APA and providing financial representations, the allegations permit an inference of planning and coordination. Accordingly, this counterclaim withstands dismissal.

---

[181] KAABOO & Managers Op. Br. at 31 (citing *Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *9 n.33 (Del. Ch. July 24, 2009)).

[182] *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, 2020 WL 4355555, at *21 (Del. Ch. July 30, 2020) (citing *Empire Fin. Servs., Inc. v. Bank of N.Y.*, 900 A.2d 92, 97 n.16 (Del. 2006)).

[183] *Agspring*, 2020 WL 4355555, at *21 (internal quotation marks omitted); *see Prairie Cap. III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 64-65 (Del. Ch. 2015) (finding civil conspiracy theory survived motion to dismiss where no explicit agreement was alleged).

### 4. The Fraud Allegations are Not Bootstrapped Breach-of-Contract Claims.

As a last resort, the KAABOO Entities and Managers suggest the fraud allegations are inadequate because they are really breach-of-contract allegations. It is true that "[a] contracting party may not bootstrap a breach of contract claim into a fraud claim merely by adding [words of fraud] or alleging that the contracting parties never intended to perform."[184] "A bootstrapped fraud claim . . . [which] takes the simple fact of nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud" is indeed a non-starter.[185] But, contractual representations may form the basis of a fraud claim "where a plaintiff has . . . made particularized allegations that a [counterparty] knew contractual representations were false or lied regarding [a] contractual representation. . . ."[186] And when distinguishing fraud and breach-of-contract claims, Delaware courts generally look

---

[184] *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *11 (Del. Ch. Aug. 25, 2020) (internal quotation marks omitted).

[185] *Smash Franchise Partners, LLC v. Kanda Holdings, Inc.*, 2020 WL 4692287, at *16 (Del. Ch. Aug. 13, 2020).

[186] *Pilot Air Freight, LLC v. Manna Freight Sys., Inc.*, 2020 WL 5588671, at *26 (Del. Ch. Sept. 18, 2020) (citing *Smash*, 2020 WL 4692287, at *11) (internal quotation marks omitted); *see Anschutz Corp. v. Brown Robin Cap., LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020).

to the timing of the alleged misconduct to determine whether the inducement to deal is "separate and distinct" from the inducement to perform.[187]

Here, the Virgin Fest Entities have not alleged the Managers' fraud was a ruse to shirk performance. To the contrary, they allege the Managers defrauded them into executing an agreement that the KAABOO Entities intended to honor—except on terms secretly unfavorable to the Virgin Fest Entities. And because all of the alleged fraud happened pre-closing, it is reasonably conceivable that the Managers' acts of inducement were calculated to obtain signatures, not to dictate the manner in which obligations were to be discharged.[188] Because the Virgin Fest Entities proffer "particularized allegations" about the Managers' knowledge of the "false . . . contractual representation[s]" they developed during the bargaining process and ultimately memorialized in the APA, the fraud-based counterclaims are not impermissibly bootstrapped.[189]

---

[187] *EZLinks Golf*, 2017 WL 1312209, at *5 (citations omitted); *see Pilot Air*, 2020 WL 5588671, at *26 (observing that bootstrapping is not present "when the conduct occurs prior to the execution of the contract and 'thus with the goal of inducing the plaintiff's signature and willingness to close on the bargain.'" (quoting *In re Bracket Holding Corp. Litig.*, 2017 WL 3283169, at *18-19 (Del. Super. Ct. July 31, 2017))).

[188] *See Pilot Air*, 2020 WL 5588671, at *26; *In re Bracket*, 2017 WL 3283169, at *18-19.

[189] *Pilot Air*, 2020 WL 5588671, at *26; *see EZLinks Golf*, 2017 WL 1312209, at *5 (Court "focus[es] on when the fraudulent conduct is alleged to have occurred" when evaluating a bootstrapping argument).

## V. CONCLUSION

This case seems far from ready for the lights to come up. But as the parties rehearse, the Court **GRANTS** Investco's motion (Motion I) and **DISMISSES** the tortious interference claim and **DENIES** the KAABOO Entities and Managers' motion (Motion II).

**IT IS SO ORDERED.**

*/s/ Paul R. Wallace*
**Paul R. Wallace, Judge**
